**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 25-cv-02087-NYW-STV

CENTIMARK CORPORATION,

      Plaintiffs,

v.

NIKOLAUS HILFER,
NATIONS ROOF, LLC, and
NATIONS ROOF OF COLORADO, LLC,

      Defendants.

---

## ORDER

---

      This matter is before the Court on CentiMark's Motion for Preliminary Injunction Against Nikolaus Hilfer, Nations Roof, LLC, and Nations Roof of Colorado, LLC (the "Motion for Preliminary Injunction"), [Doc. 18],[1] and Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (the "Motion to Dismiss"), [Doc. 54]. The Court has reviewed the Motions, the corresponding briefs, and applicable case law, and the Court concludes that oral argument would not assist in the resolution of the Motions.[2] For the reasons set forth in this Order, the Motion to Dismiss is **GRANTED in part** and **DENIED**

---

[1] This Court uses the convention [Doc. ___] to refer to materials filed on the docket in this case. In so doing, the Court cites to the page numbers assigned by the District's Electronic Case Files system.

[2] In addition, no Party requested an evidentiary hearing on the Motion for Preliminary Injunction. [Doc. 18; Doc. 43]. Federal Rule of Civil Procedure 65 does not require this Court to hold a hearing, *see* Fed. R. Civ. P. 65, and the Court has discretion to determine if a hearing is necessary, *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014). The Court does not find a hearing necessary to rule on the Motion for Preliminary Injunction.

**in part** and the Motion for Preliminary Injunction is **DENIED**.

BACKGROUND

Plaintiff CentiMark Corporation ("Plaintiff" or "CentiMark") employed Defendant Nikolaus Hilfer ("Mr. Hilfer") from February 2004 until the fall of 2024.  [Doc. 32 at ¶¶ 35, 53–54].  At the end of his employment with CentiMark, Mr. Hilfer was a senior national accounts manager, responsible for "manag[ing] all aspects of CentiMark's sales to National Accounts with offices or employees located in Colorado," "preparing and presenting bid packages for current and prospective customers," and "managing key CentiMark national accounts located in Colorado."  [*Id.* at ¶¶ 47–50].

As consideration for his employment, Mr. Hilfer signed an agreement that contained non-solicitation and non-disclosure provisions (the "Hilfer Agreement").  [*Id.* at ¶¶ 36–42].  However, before he resigned from his employment with CentiMark, Mr. Hilfer "sent multiple emails containing CentiMark Confidential Information and trade secrets from his CentiMark account to his personal email address."  [*Id.* at ¶ 51].  Materials in those emails included customer contact information, project proposals and assessments, account management strategies, and "other Confidential Information and trade secrets." [*Id.* at ¶¶ 51–52].

Mr. Hilfer is currently employed by "Nations Roof, LLC [('Nations')], one of CentiMark's direct competitors in the roofing industry, or its subsidiary Nations Roof of Colorado LLC [('NROC')]," and has been since October 2024.  [*Id.* at ¶¶ 2, 53].[3]  In June 2025, Plaintiff was notified that "one of its top clients, a well-known Colorado sports and hospitality client" that Plaintiff refers to as "Customer A," was "working with someone at

_____

[3] Plaintiff refers to Nations and NROC collectively as "Nations Roof."  [Doc. 32 at 1].

Nations Roof who had previously worked for CentiMark." [*Id.* at ¶ 56]. A Customer A representative confirmed that the company was working with Mr. Hilfer, who had managed Customer A's account at CentiMark. [*Id.* at ¶¶ 56–57]. CentiMark later learned that Mr. Hilfer began "soliciting contracts from a key CentiMark account that serves as a commercial real estate services and investment firm," referred to as "Customer C," in direct competition with CentiMark. [*Id.* at ¶¶ 60–62]. And since Mr. Hilfer joined Nations and/or NROC, "CentiMark has noticed a significant increase in attempts by Nations Roof to recruit CentiMark [employees], particularly CentiMark employees who are in possession of Confidential Information and trade secrets." [*Id.* at ¶ 66].

CentiMark alleges, on information and belief, that Mr. Hilfer has used CentiMark's Confidential Information and trade secrets to benefit his career at Nations and/or NROC, in breach of the Hilfer Agreement. [*Id.* at ¶¶ 63, 86–90, 102]. Plaintiff filed its original Complaint on July 7, 2025, [Doc. 1], and filed an Amended Complaint on August 29, 2025, [Doc. 32]. Therein, Plaintiff asserts eight claims: (1) a breach of contract claim against Mr. Hilfer ("Claim One"); (2) a misappropriation claim under the Colorado Uniform Trade Secrets Act ("CUTSA") against Mr. Hilfer ("Claim Two"); (3) a claim for breach of fiduciary duty against Mr. Hilfer ("Claim Three"); (4) an unjust enrichment claim against Mr. Hilfer ("Claim Four"); (5) a claim for tortious interference with contracts against all Defendants ("Claim Five"); (6) an unjust enrichment claim against Nations and NROC ("Claim Six"); (7) a claim for tortious interference with prospective business relations against all Defendants ("Claim Seven"); and (8) a civil conspiracy claim against all Defendants ("Claim Eight"). [*Id.* at ¶¶ 80–150].

Plaintiff filed its Motion for Preliminary Injunction on August 8, 2025. [Doc. 18]. It

requests a preliminary injunction:

> 1.      Requiring [Defendants] to return or destroy all CentiMark Confidential Information Hilfer sent or copied to his personal email accounts, to his home email address, or to any other non-CentiMark destination or device;
>
> 2.      Requiring [Defendants] to immediately cease contact with any CentiMark customer with whom Hilfer had contact within one year of his departure from CentiMark;
>
> 3.      Requiring [Defendants] to cease contact with any customer or potential customer listed in Hilfer's CentiMark sales "workbooks" (as described below), or the "workbooks" of any other CentiMark employees which Hilfer surreptitiously sent to his personal email address, for the years 2023 and 2024;
>
> 4.      Requiring [Defendants] to immediately cease attempts to solicit and/or recruit CentiMark employees, as outlined in the Hilfer Agreement, with whom [Defendants] had contact within one year of Hilfer's departure from CentiMark;
>
> 5.      Requiring [Nations and NROC] to cease its attempts to interfere with CentiMark's employment agreements with its employees; and
>
> 6.      Extending the post-employment restrictive covenants in the Hilfer Agreement for one year following the entry of this Court's Order.

[*Id.* at 2].

On September 23, 2025, Defendants moved to dismiss seven of Plaintiff's eight claims; among other arguments, Defendants contend that the Court lacks personal jurisdiction over Nations and NROC.  [Doc. 54].  Because the Court must ensure itself of its jurisdiction over all Defendants before entering any sort of preliminary injunction, *see Nat'l Union Fire Ins. Co. of Pittsburgh v. Kozeny*, 19 F. App'x 815, 822 (10th Cir. 2001) (before entering a preliminary injunction, the plaintiff must show a "reasonable probability" that it will prevail on the issue of personal jurisdiction on the merits), the Court will first address the Motion to Dismiss before turning to the Motion for Preliminary Injunction.

I.      **Motion to Dismiss**

      A.      **Personal Jurisdiction**

            1.      **Legal Standards**

Personal jurisdiction is "an essential element of the jurisdiction of a district . . . court," and without it, "the court is 'powerless to proceed to an adjudication.'"  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Emps. Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937) (alteration in original)).  A plaintiff bears the burden of demonstrating a court's personal jurisdiction over all defendants, *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007), but the burden "in the preliminary stages of litigation . . . is 'light,'" *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (quotation omitted).

To demonstrate that a court has personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction complies with the Fourteenth Amendment's Due Process Clause.  *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228 (10th Cir. 2020).  Courts assessing personal jurisdiction must "focus on state law, and particularly, the relevant state's long-arm statute."  *Id.*  In Colorado, only one inquiry is necessary, as Colorado's long-arm statute "confer[s] the maximum jurisdiction permitted by the due process clauses of the United States and Colorado constitutions," and its requirements are necessarily addressed under a due process analysis.  *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005).  "Therefore, if jurisdiction is consistent with the due process clause, Colorado's long arm statute authorizes jurisdiction over a nonresident defendant."  *Benton v. Cameco Corp.*,

375 F.3d 1070, 1075 (10th Cir. 2004).

When a court decides a Rule 12(b)(2) motion to dismiss without holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). The Court accepts the well-pleaded allegations in the complaint as true "unless they are controverted by sworn statements." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 836 (10th Cir. 2020). The Court does not take conclusory or speculative allegations as true. *Dental Dynamics*, 946 F.3d at 1228; *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

### 2.    Analysis

There are two types of personal jurisdiction:  specific jurisdiction and general jurisdiction. Specific jurisdiction exists if the lawsuit arises out of or relates to the defendant's contacts with the forum. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017). General jurisdiction "permits a court to adjudicate any cause of action against" the defendant, "wherever arising, and whoever the plaintiff." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016). In either case, due process requires that the defendant "have 'minimum contacts' with the forum . . ., such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1070 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Here, Plaintiff does not suggest that this Court has general jurisdiction over Nations or NROC, *see* [Doc. 65 at 4–6; Doc. 32 at ¶¶ 27–28], and the Parties' arguments are limited to specific jurisdiction, [Doc. 54 at 3; Doc. 65 at 4].

"The minimum contacts test for specific jurisdiction encompasses two distinct

requirements." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir.

2017).  First, the defendant must have purposefully directed its activities at the forum or

its residents.  *Id.*; *see also Dudnikov*, 514 F.3d at 1071.  This requirement "ensures that

defendants will not be haled into court in foreign jurisdictions solely as a result of 'random,

fortuitous, or attenuated contacts.'"  *Dental Dynamics*, 946 F.3d at 1229 (quoting *Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  Second, the plaintiff's injuries must

have arisen out of the defendant's forum-related activities.  *Old Republic*, 877 F.3d at

904.  This requirement "makes sure an adequate connection exists between the forum

and the underlying controversy."  *Dental Dynamics*, 946 F.3d at 1229.

### a.    Purposeful Direction

Plaintiff argues, among other things, that Nations and NROC "can . . . be subject

to personal jurisdiction in Colorado based on the imputed contacts of their agent," Mr.

Hilfer.  [Doc. 65 at 5].  Colorado's long-arm statute provides, in pertinent part:

> (1)  Engaging in any act enumerated in this section by any person, whether
> or not a resident of the state of Colorado, either in person or by an agent,
> submits such person and, if a natural person, such person's personal
> representative to the jurisdiction of the courts of this state concerning any
> cause of action arising from:
>
> > (a) The transaction of any business within this state; [or]
> >
> > (b) The commission of a tortious act within this state.

Colo. Rev. Stat. § 13-1-124(1)(a)–(b).

"Because personal jurisdiction requires a purposeful act by the defendant 'itself,'

personal jurisdiction is not associational or derivative in nature."  *Tripoli Mgmt., LLC v.*

*Waste Connections of Kan., Inc.*, No. 09-cv-01767-CMA-KLM, 2010 WL 845927, at *6

(D. Colo. Mar. 9, 2010) (citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S.

102, 109 (1987)).    However, under Colorado law, "the contacts of an agent can be imputed to the principal for purposes of personal jurisdiction."  *Id.* (citing *Goettman v. N. Fork Valley Rest.*, 176 P.3d 60, 67 (Colo. 2007)); *see also Goettman*, 176 P.3d at 67 ("[U]nder Colorado's long-arm statute, a nonresident defendant may be subject to personal jurisdiction in Colorado based on the imputed contacts of the defendant's agent.").  "In that situation, the agent is regarded as the defendant 'itself.'"  *Tripoli Mgmt.*, 2010 WL 845927, at *6.

Companies "act through agents:  'It is familiar law that a corporation can only act through its agents, and their acts within the scope of their authority are the acts of the [company].'"  *Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997) (quoting *Orphan Belle Mining & Milling Co. v. Pinto Mining Co.*, 85 P. 323, 325 (1906)).  And "[t]he contacts of an agent may generally be imputed to the principal if those contacts are made within the scope of the agent's employment."  *Shepherd v. U.S. Olympic Comm.*, 94 F. Supp. 2d 1136, 1142 (D. Colo. 2000).  Here, CentiMark argues that Mr. Hilfer's actions in Colorado were done as Nations's and NROC's agent and thus his contacts with the forum can be imputed to these entities.  [Doc. 65 at 5–6].  Plaintiff alleges, inter alia, that Mr. Hilfer's solicitous actions were done during and in the scope of his employment with Nations and NROC, [Doc. 32 at ¶¶ 4, 56, 63–64, 66], and that Mr. Hilfer's actions were done for the benefit of Nations and NROC and "for the purpose of allowing [Nations and NROC] to unfairly compete against CentiMark," [*id.* at ¶¶ 3, 64, 87, 102].

"[A] plaintiff need only make a prima facie showing of the connection between the actions of the agent and the principal to defeat a motion to dismiss for lack of personal jurisdiction."  *Goettman*, 176 P.3d at 68.  At this preliminary stage of the proceedings, the

Court finds that Plaintiff plausibly alleges that Mr. Hilfer was acting as Nations's and NROC's agent at the time of the conduct challenged in the Amended Complaint. *See KKW Trucking, Inc. v. Castellano 03 Trucking, L.L.C.*, No. 19-cv-02351-REB-NYW, 2020 WL 13470239, at *5 (D. Colo. Oct. 20, 2020) (concluding that allegations were sufficient to establish personal jurisdiction over employer where employee committed tort in Colorado in the scope of her employment), *report and recommendation adopted*, 2020 WL 13470123 (D. Colo. Nov. 12, 2020); *Richfield Hosp., Inc. v. Charter One Hotels & Resorts, Inc.*, No. 2011CV3916, 2012 WL 3069680, at *3 (Colo. Dist. Ct. Feb. 21, 2012) (finding personal jurisdiction over employer based on employee's commission of tort that caused an injury in Colorado).

In so concluding, the Court does not hold or suggest that an employee is *necessarily* acting as an employer's agent or that an employee's contacts are *always* imputed to an employer for purposes of personal jurisdiction. But in this case and at this stage, Plaintiff's allegations adequately allege that Mr. Hilfer was acting at the behest of Nations and NROC. *See, e.g.*, [Doc. 32 at ¶ 66 (Plaintiff alleging that since Nations's and NROC's employment of Mr. Hilfer, these entities have significantly increased their attempts to recruit CentiMark employees); *id* at ¶ 123 (alleging that Nations and NROC encouraged and assisted Mr. Hilfer in breaching the Hilfer Agreement); *id.* at ¶ 134 (alleging that Nations and NROC collaborated with Mr. Hilfer "to utilize CentiMark's Confidential Information to improperly solicit CentiMark's existing or prospective customers")].[4] Moreover, Plaintiff also alleges that Nations and NROC ratified Mr. Hilfer's

---

[4] Defendants suggest that Plaintiff's allegations are conclusory. *See* [Doc. 54 at 5–6; Doc. 68 at 3]. It is unclear to the Court, though, how Plaintiff could provide more detailed factual allegations about information that is exclusively in Defendants' possession (i.e.,

allegedly solicitous conduct, which is another avenue through which an agency relationship can be established. See [*id.* at ¶ 56 (alleging that Mr. Hilfer was "working with" one of CentiMark's top Colorado clients and that Nations and NROC were "bidding on all of [this customer's] capital work"); *id.* at ¶ 61;[5] *see also* Restatement (Third) Of Agency § 4.01 (2006). In sum, because Plaintiff has plausibly alleged that Mr. Hilfer was acting in the scope of his employment and as Nations's and NROC's agent, his Colorado-specific contacts may be imputed to Nations and NROC and will be considered the entities' own contacts under the Colorado long-arm statute. Colo. Rev. Stat. § 13-1-124(1)(a)–(b); *Tripoli Mgmt.*, 2010 WL 845927, at *6.[6]

---

Nations's and NROC's level of involvement in, or direction of, Mr. Hilfer's solicitation of clients in Colorado), particularly given Plaintiff's "light" burden at this stage of the proceedings. *Intercon, Inc.*, 205 F.3d at 1247.

[5] Defendants argue that this allegation contains facts "subject to the competitor's privilege," so "even to the extent that this one alleged action could otherwise be found to sustain personal jurisdiction. . ., it would be subject to privilege and, therefore, could not alone sustain personal jurisdiction over Nations/NROC." [Doc. 54 at 7–8]. This argument is not supported by legal authority or explanation as to why this alleged contact cannot be used in the personal jurisdiction analysis, which is separate and distinct from the merits of Plaintiff's claims.

[6] Because the Court concludes that Mr. Hilfer's contacts can be imputed to Nations and NROC, the Court is respectfully unpersuaded by Defendants' argument challenging "Plaintiff's reliance on group pleading," which relies on cases applying a Rule 12(b)(6) standard. [Doc. 54 at 8]. To be sure, courts often find that collective allegations fail to meet pleading standards under Rule 12(b)(6). *See, e.g.*, *Glaser v. City & Cnty. of Denver*, 557 F. App'x 689, 703 (10th Cir. 2014); *Gamble v. Hansen*, No. 1:24-cv-00134-JCB, 2025 WL 18701, at *4 (D. Utah Jan. 2, 2025). But here, Plaintiff alleged (before discovery commenced) that Mr. Hilfer is an employee of Nations or NROC, [Doc. 32 at ¶¶ 2, 11], and without discovery, Plaintiff has presumably not yet had an opportunity to conclusively determine which entity employs Mr. Hilfer (or if he is employed by both). This information would be in the exclusive control of Defendants, and they could have, but did not, submit affidavits or other evidence clarifying which entity is Mr. Hilfer's employer. Accordingly, where Plaintiff has alleged that Mr. Hilfer is employed by both entities, and these allegations are not contradicted by affidavits, the Court takes these allegations as true and finds that, at this time, Mr. Hilfer's contacts with Colorado may be imputed to both Nations and NROC. *XMission*, 955 F.3d at 836.

The Court thus must determine whether Plaintiff has established *Mr. Hilfer's* Colorado contacts, to be imputed to Nations and NROC for purposes of specific jurisdiction. In so doing, the Court considers all of the principal's contacts with the forum, including the resident agent's contacts, to determine if those contacts are sufficient to support specific personal jurisdiction. *Griffith v. SSC Pueblo Belmont Operating Co.*, 381 P.3d 308, 314 (Colo. App. 2016). While a close call, the Court finds that Plaintiff's allegations are sufficient to meet its "light" burden at this stage of the proceedings and establish contacts with Colorado that are sufficient at the pleading stage to establish specific personal jurisdiction over Nations and NROC.

Mr. Hilfer is a Colorado resident. [Doc. 32 at ¶ 23]. Despite Defendants' well-taken point that the Amended Complaint contains scant allegations that expressly identify Mr. Hilfer's Colorado-specific conduct, *see* [Doc. 54 at 5], the Court may still infer that Mr. Hilfer's actions alleged in the Amended Complaint were taken in Colorado, where he lives and is employed, *see Ziegler v. Dale*, No. 18-cv-00071-SWS, 2018 WL 8131670, at *6 (D. Wyo. Dec. 7, 2018); s*ee also* [Doc. 32 at ¶¶ 9, 51, 56–69 (allegations detailing Mr. Hilfer's alleged improper or tortious conduct)]. With respect to Colorado-based customers or accounts, Plaintiff alleges that Mr. Hilfer solicited business from "a well-known Colorado sports and hospitality client," Customer A. [*Id.* at ¶ 56]. This customer is or was one of CentiMark's "top clients." [*Id.*]. Plaintiff alleges that Mr. Hilfer has used CentiMark's "Confidential Information and trade secrets" to solicit business opportunities "to benefit his career" with Nations and NROC. [*Id.* at ¶ 63]. In other words, Plaintiff has alleged that Mr. Hilfer, acting in the scope of his employment and as Nations's and NROC's agent, committed tortious acts from within the state of Colorado, including through contacts with

a Colorado client.  The Court finds that these allegations are sufficient at the pleading stage to establish purposeful direction.

Plaintiff must also demonstrate, however, that its claims arise out of or relate to Mr. Hilfer's Colorado contacts.  *Craig Hosp. v. Blue Cross Blue Shield of Kan.*, 557 P.3d 820, 828 (Colo. App. 2024); *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021).  Defendants argue that "CentiMark's statutory argument . . . misses the mark" because the claims against Nations and NROC do not arise out of Nations's or NROC's Colorado contacts.  [Doc. 68 at 2–3].  The Court respectfully disagrees.  As explained above, *Mr. Hilfer's* Colorado contacts are the Court's focus, not Nations's or NROC's.  And here, Plaintiff has established a sufficient link between Mr. Hilfer's Colorado contacts and the claims asserted against Nations and NROC, such that the claims against the entities "relate to" Mr. Hilfer's Colorado activities.  *See Bristol-Myers Squibb*, 582 U.S. at 262 (the claims must "arise out of or relate to the defendant's contacts with the forum" (cleaned up)); *Ford Motor Co.*, 592 U.S. at 362 (explaining that the "relate to" requirement is more flexible than the "arising out of" requirement).  Specifically, Plaintiff alleges that Nations and NROC tortiously interfered with its contracts and business relationships by encouraging and assisting (and conspiring with) Mr. Hilfer to breach the Hilfer Agreement and solicit CentiMark's customers, including Customer A, for Nations's and NROC's benefit, [Doc. 32 at ¶¶ 123, 127–29, 142, 144, 147–48], and that as a result of Mr. Hilfer's Colorado-based solicitous conduct, Nations and NROC were unjustly enriched, [*id.* at ¶ 134].  Plaintiff has established that its claims against Nations and NROC relate to Mr. Hilfer's Colorado contacts.

### b.     Fair Play and Substantial Justice

Having concluded that the "minimum contacts" requirement is satisfied, the Court must determine whether exercising personal jurisdiction over Nations and NROC would "offend traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080. "Instances where an otherwise valid exercise of personal jurisdiction would be constitutionally unfair are 'rare.'" *Hood v. Am. Auto Care*, *LLC*, 21 F.4th 1216, 1227 (10th Cir. 2021) (quoting *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1289 (10th Cir. 2020)).  A defendant may defeat personal jurisdiction in this way "by presenting a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *XMission*, 955 F.3d at 840 (quoting *Burger King*, 471 U.S. at 477).  Here, Defendants do not make any such argument, *see* [Doc. 54], and so they have not made such a showing, *see Niemi v. Lasshofer*, 770 F.3d 1331, 1350 (10th Cir. 2014).  Accordingly, the Court declines to dismiss Plaintiff's claims against Nations or NROC for lack of personal jurisdiction.

### B.     Rule 12(b)(6)

Defendants also raise several arguments for dismissal under Rule 12(b)(6), including (1) some of Plaintiff's allegations are insufficient to state a claim; (2) some of Plaintiff's claims are preempted by CUTSA; and (3) some of Plaintiff's claims are barred by the economic loss rule.  The Court finds it most efficient to address the Parties' arguments on a claim-by-claim basis.

1.    **Legal Standard**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). The plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

2.    **Analysis**

a.    **Claim Two: CUTSA Misappropriation**

Defendants argue that Plaintiff's CUTSA claim should be dismissed for two reasons: first, they contend that Plaintiff fails to actually identify or describe the supposed trade secrets that form the basis of the claim, and second, they argue that Plaintiff fails to allege facts showing that the trade secrets were actually kept secret. [Doc. 54 at 10–13].

To plausibly state a misappropriation claim under CUTSA, a plaintiff must allege "(i) that [the plaintiff] possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 847 (10th Cir. 1993). A trade secret is defined in the statute as "the whole or any portion or phase of any scientific or technical information, design, process,

procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value."  Colo. Rev. Stat. § 7-74-102(4).  The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has affirmed the dismissal of a CUTSA misappropriation claim where the operative pleading "lacked allegations identifying the information . . . that may have been a protected trade secret."  *LS3 Inc. v. Cherokee Nation Strategic Programs, L.L.C.*, No. 21-1385, 2022 WL 3440692, at *5 (10th Cir. Aug. 17, 2022).  And in cases analyzing the sufficiency of claims under the analogous federal Defend Trade Secrets Act ("DTSA"), courts have indicated that a plaintiff must identify the trade secrets at issue with *some* particularity.  *See, e.g.*, *Kiosk Info. Sys., Inc. v. Cole Kepro Int'l, LLC*, No. 23-cv-00352-GPG-KLM, 2023 WL 4269409, at *4 (D. Colo. June 29, 2023), *report and recommendation adopted*, 2023 WL 7458353 (D. Colo. Oct. 11, 2023); *Wright Med. Tech., Inc. v. Paragon 28, Inc.*, No. 18-cv-00691-PAB-STV, 2019 WL 4751807, at *3 (D. Colo. Sept. 30, 2019).

But this pleading requirement is not a high bar.  "At the motion to dismiss stage, a plaintiff need not identify the specific documents or records that were allegedly misappropriated, . . . or establish that a particular category of information is, in fact, a trade secret."  *Hauschild GMBH & CO. KG v. FlackTek, Inc.*, No. 20-cv-02532-PAB-STV, 2022 WL 392501, at *9 (D. Colo. Feb. 9, 2022) (DTSA case).  A plaintiff simply must identify the alleged trade secrets with enough specificity to put the defendant on notice about what information or material is at issue.  *Kiosk Info. Sys.*, 2023 WL 4269409, at *4. "Simply identifying specific categories of documents and information allegedly misappropriated is sufficient to identify trade secret information at the motion to dismiss

stage." *Id.*

CentiMark alleges that it "possesses valuable trade secrets, including but not limited to certain business information and proprietary marketing strategies, relating to the roofing business, its operations, its customers, its employees, its financial data, and its products." [Doc. 32 at ¶ 94]. It also alleges that Mr. Hilfer was "exposed to CentiMark's . . . trade secrets, . . . including profit margins, pricing, unique problems or difficulties faced with customers and/or projects that could be exploited by a competitor, customer contact information, sales lists, and sales volumes of customers." [*Id.* at ¶ 77]. And it specifically identifies "CentiMark monthly 'Workbooks'" that "contain[] the names of [its] most valuable accounts, along with each account's purchase history going back to 2020," "target accounts and sales prospects," and "sales histories." [*Id.* at ¶ 52]. Courts in this District have found similar allegations sufficient to survive a motion to dismiss. *See, e.g.*, *Wright Med. Tech.*, 2019 WL 4751807, at *3; *Kiosk Info. Sys.*, 2023 WL 4269409, at *5; *SBM Site Servs., LLC v. Garrett*, No. 10-cv-00385-WJM-BNB, 2012 WL 628619, at *10 (D. Colo. Feb. 27, 2012). Indeed, "[t]he cases rejecting trade secret claims for lack of specificity are predominantly at later stages in the litigation process." *SBM Site Servs.*, 2012 WL 628619, at *10. And although Defendants assert that they cannot ascertain what constitutes a "trade secret" versus other "Confidential Information" referenced in the Amended Complaint, [Doc. 54 at 11], they do not explain why a clear delineation must be ascertained at the pleading stage. Accordingly, the Court declines to dismiss the CUTSA claim on this basis.

As for Defendants' other argument, the Court also finds that it does not provide a persuasive basis for dismissal. Recognizing that, to constitute a trade secret under

CUTSA, the owner of the trade secret "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes," Colo. Rev. Stat. § 7-74-102(4), Defendants contend that Plaintiff fails to allege that its trade secrets are private, since "CentiMark acknowledges that the putative 'trade secrets' here have been disclosed to third parties," [Doc. 54 at 12]. In support, Defendants reference paragraph 79 of the Amended Complaint, which alleges that "[t]o the extent any of CentiMark's Confidential Information, including but not limited to, its known relationships with certain clients, its public bid proposals, and its Roof Assessment and Proposed Solution Documents, are provided to third parties like its customers, it maintains independent value to CentiMark's business and is protectable." [Doc. 32 at ¶ 79]. Not only does this paragraph not address the numerous categories of trade secrets identified above, but Plaintiff also clarifies in its Response its position that the Roof Assessment and Proposal Solution Documents "may not be considered trade secrets given that customers receive them for their own accounts" but that, in its view, these documents are "still protectable." [Doc. 65 at 9 n.2]. Therefore, Defendants' argument does not persuade the Court that dismissal is warranted on this basis.

Plaintiff alleges in its Amended Complaint that it "has taken considerable efforts to ensure that its unique strategies, processes, and information remain confidential, including but not limited to, requiring its employees to sign restrictive covenants, ensuring databases are password-protected, and requiring multi-factor authentication for access to Confidential Information and trade secrets." [Doc. 32 at ¶ 72]. It also alleges that it took other measures to protect its trade secrets, such as "requiring employment

agreements with appropriate restrictive covenants for top management-level employees, restricting access to trade secrets to only those employees who require the information to perform their job functions, password-protecting its databases with trade secrets, and utilizing multi-factor authentication." [*Id.* at ¶ 98]. These allegations are sufficient to allege that Plaintiff took measures to protect its trade secrets. The Court will not dismiss the CUTSA claim under Rule 12(b)(6).

### b.    Claim Three:  Breach of Fiduciary Duty

Plaintiff alleges that Mr. Hilfer breached the duties of "loyalty, good faith, and fair dealing" that he owed to CentiMark. [Doc. 32 at ¶ 107]. Defendants argue that this claim should be dismissed because (1) the claim is preempted by CUTSA, [Doc. 54 at 13–14]; and (2) it is barred by the economic loss rule, [*id.* at 17–20].

***CUTSA Preemption.***  CUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."  Colo. Rev. Stat. Ann. § 7-74-108(1).  In other words, "CUTSA preempts common law claims that 'conflict' with its trade secret misappropriation provisions."  *Abbott Labs v. Finkel*, No. 17-cv-00894-CMA-KMT, 2017 WL 5517399, at *3 (D. Colo. Nov. 17, 2017) (citing *Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996)).  The statute does not displace "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret," or "[o]ther civil remedies that are not based upon misappropriation of a trade secret."  Colo. Rev. Stat. § 7-74-108(2).

"[I]f a common law claim is no more than a restatement of the same operative facts which would plainly and exclusively spell out trade secret misappropriation, preemption is appropriate."  *Abbott Labs*, 2017 WL 5517399, at *3.  However, when a claim "involv[es]

a trade secret misappropriation issue" but also "include[s] additional elements not necessary for a misappropriation claim" under CUTSA, the claim is not preempted. *Powell*, 948 F. Supp. at 1474; *see also Wright Med. Tech*, 2019 WL 4751807, at *5. "The salient question in addressing . . . preemption is whether a challenged common law claim depends solely on a finding of trade secret status to be actionable. Where it does not, the claim is not preempted." *Virtual Cloud Servs., Inc. v. CH2M Hill, Inc.*, No. 02-cv-01004-JLK-BNB, 2006 WL 446077, at *2 (D. Colo. Feb. 21, 2006).

To state a claim for breach of fiduciary duty, a plaintiff must allege "(1) that the defendant was acting as a fiduciary of the plaintiff; (2) that the defendant breached a fiduciary duty to the plaintiff; (3) that the plaintiff incurred damages; and (4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages." *Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1172 (10th Cir. 2008) (citing *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993)).

Defendants argue that the fiduciary duty claim is preempted because Plaintiff supports the claim only with allegations that Mr. Hilfer allegedly sent Plaintiff's trade secret information to his personal email address. [Doc. 54 at 14]. Plaintiff responds that the fiduciary duty claim "plainly refers to Hilfer's duties of loyalty, good faith, and fair dealing that he owed to CentiMark" and that "[u]nder a duty of loyalty, employees maintain a responsibility not to prepare to unfairly compete with their employers concerning the subject matter of their employment." [Doc. 65 at 11]. It argues that Mr. Hilfer breached his fiduciary duties to CentiMark by, inter alia, using CentiMark's confidential information to make sales calls to CentiMark customers and solicit their business, which amounted to competing with CentiMark while still employed by the company. [*Id.*; Doc. 32 at ¶¶ 14,

109–10].

Claim Three is not preempted.  Plaintiff could succeed on Claim Three based on Mr. Hilfer's alleged improper solicitations even without a conclusion that the information he allegedly misused was a trade secret.  Because this claim does not depend on trade secret status and includes elements not necessary for a misappropriation claim, the claim is not preempted by CUTSA.  Colo. Rev. Stat. § 7-74-108(2); *Powell*, 948 F. Supp. at 1474; *Virtual Cloud Servs.*, 2006 WL 446077, at *3 n.3 (breach of fiduciary duty claim was not preempted because the claim "would be actionable independently of any claim that [the defendant] misappropriated [the plaintiff's] purported trade secrets").

***Economic Loss Rule.***  Next, Defendants argue that this claim should be dismissed pursuant to the economic loss rule.  [Doc. 54 at 17].  Colorado's economic loss rule dictates that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."  *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).  Plaintiff argues, however, that dismissal based on the economic loss rule would be premature at the pleading stage.  [Doc. 65 at 14–16].

The Court respectfully agrees with Plaintiff that a ruling based on the economic loss doctrine would be premature at these early stages of the case.  Courts in this District routinely decline to dismiss claims at the pleading stage based on the economic loss rule. *See, e.g.*, *Bartch v. Barch*, No. 18-cv-03016-RBJ-NYW, 2022 WL 3597119, at *3 (D. Colo. May 9, 2022) ("I decline to dismiss the conversion claim at this stage. . . .  Plaintiff is permitted to plead the contract and conversion claims in the alternative."); *GEA Power Cooling Sys., LLC v. Bechtel Power Corp.*, No. 09-cv-02051-RPM, 2010 WL 1241290, at

*1 (D. Colo. Mar. 18, 2010) ("While an election may be required at some time before trial, a ruling on the applicability of the economic loss rule at this pleading stage would be premature."); *Affordify, Inc. v. Medac, Inc.*, No. 19-cv-02082-CMA-NRN, 2019 WL 7756063, at *3 (D. Colo. Dec. 26, 2019) (agreeing that dismissal based on economic loss rule would be "premature" at the pleading stage), *report and recommendation adopted*, 2020 WL 417554 (D. Colo. Jan. 25, 2020); *M.M.A. Design, LLC v. Capella Space Corp.*, No. 18-cv-02957-MSK-NRN, 2019 WL 3973935, at *4 (D. Colo. Aug. 21, 2019) (declining to address economic loss rule, as it was "a matter that [was] best deferred to future summary judgment proceedings").

"[I]nconsistent contract and tort claims may be pled in the alternative." *Gorsuch, Ltd. v. Wells Fargo Nat'l Bank Ass'n*, No. 11-cv-00970-PAB-MEH, 2013 WL 6925132, at *3 (D. Colo. Dec. 13, 2013), *aff'd*, 771 F.3d 1230 (10th Cir. 2014); *see also* Fed. R. Civ. P. 8(d)(3). At this time, Defendants have not filed an answer to the Amended Complaint, and have thus not admitted nor denied the existence or validity of the Hilfer Agreement. The Court declines to make a ruling on the applicability of the economic loss rule at this time and elects to wait until a more fulsome record is developed through discovery. Accordingly, the Court will not dismiss Claim Three.

### c.    Claim Four:  Unjust Enrichment Against Mr. Hilfer

Defendants seek dismissal of Plaintiff's unjust enrichment claim against Mr. Hilfer on three grounds:  (1) the claim is preempted by CUTSA, [Doc. 54 at 13–16]; (2) the claim is barred by the economic loss rule, [*id.* at 17–20]; and (3) Plaintiff's allegations are insufficient to state a plausible claim, [*id.* at 20–21. The Court finds the third argument dispositive and limits its analysis to that argument.

To state a claim for unjust enrichment, a plaintiff must allege that "(1) at [the] plaintiff's expense (2) [the] defendant received a benefit (3) under circumstances that would make it unjust for [the] defendant to retain the benefit without paying." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008). Defendants contend that Claim Four should be dismissed under Rule 12(b)(6) because Plaintiff alleges only that Mr. Hilfer received a benefit at Nations's and NROC's expense (in the form of salary, commissions, and other benefits), and not at *Plaintiff's* expense. [Doc. 54 at 21]. In its Response, CentiMark contends that Mr. Hilfer "gained significant advantages for his new role and his continued career in the roofing industry at CentiMark's expense, amounting to much, much more than merely retaining commissions and a salary from Nations Roof as a result of his bad acts." [Doc. 65 at 17]. It insists that Mr. Hilfer retained the "benefit of his knowledge and access to CentiMark's company resources," which benefited Mr. Hilfer's career. [*Id.*].

But by focusing only on whether knowledge and information gained during the course of his employment was a "benefit," Plaintiff does not direct the Court to any allegations in the Amended Complaint alleging that Mr. Hilfer received this benefit *at Plaintiff's expense*. *See* [*id.*]. In fact, the Amended Complaint alleges that Mr. Hilfer "improperly accepted and retained salary, commission payments, and other benefits *from Nations [and NROC]* for his illegal conduct" and that it would "be inequitable and unjust for Hilfer to be permitted to retain such benefits" because "[s]uch benefits properly belong to CentiMark." [Doc. 32 at ¶¶ 117–18]. And while the Amended Complaint vaguely references Plaintiff's "lost business opportunities and lost contracts or bids with existing customers," [*id.* at ¶ 92], there are no specific factual allegations detailing which

customers, contracts, or bids were lost, and in any event, Plaintiff does not attempt to tie any of these lost business opportunities to Mr. Hilfer unjustly retaining any benefit, *see* [*id.*]; *see also* [Doc. 65].

Accordingly, the Court agrees with Defendants that Plaintiff fails to state an unjust enrichment claim against Mr. Hilfer.  Accordingly, this claim will **be DISMISSED without prejudice** under Rule 12(b)(6).

### d.    Claim Five:  Tortious Interference With a Contract

As for Claim Five, Defendants argue that this claim should be dismissed based on CUTSA preemption, the economic loss doctrine, and Plaintiff's failure to state a plausible claim.  [Doc. 54 at 16–23].  Again, the Court finds the third argument dispositive.

Defendants point out that the Amended Complaint does not "identify any contracts with which Defendants allegedly interfered or that CentiMark had a reasonable expectancy of being awarded those contracts that were publicly out for bid."  [*Id.* at 21, 23–24].  They also argue that Plaintiff fails to plausibly allege that Defendants engaged in wrongful or improper conduct in any inducement.  [*Id.* at 21–23].

To state a claim for tortious interference with a contract, a plaintiff must allege that the defendant "(1) was aware of the existence of the contract; (2) intended that one of the parties breach the contract; (3) induced the party to breach the contract or make it impossible for him or her to perform; and (4) acted 'improperly' in causing the breach." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1118 (10th Cir. 2009) (citing *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004)).

Defendants argue that Plaintiff's tortious interference with a contract claim should be dismissed because the Amended Complaint does not "identify any contracts with

which Defendants allegedly interfered or that CentiMark had a reasonable expectancy of being awarded those contracts that were publicly out for bid." [Doc. 54 at 21]. CentiMark counters that it has sufficiently alleged "each of the required tortious interference elements," including that "it had a contract with a third party" and that Defendants, "through their words, conduct, or both, intentionally caused the third party not to perform or to terminate its contract with CentiMark." [Doc. 65 at 18 (citing [Doc. 32 at ¶¶ 56–63, 65, 124–25, 128–30, 132, 140–42, 145])].

With respect to customer contracts, the Court disagrees with Plaintiff's argument, which tellingly fails to identify a single customer contract that was breached or disregarded or a single "third party" that failed to follow through on its contract with CentiMark. *See* [*id*.]. The Amended Complaint's references to Plaintiff's existing clients generally, [Doc. 32 at ¶¶ 56–57, 59–60], or vague references to "numerous contractual relations" with unnamed customers, [*id*. at ¶¶ 124–25], are insufficient to plausibly allege the existence of a contract, or contracts, that Defendants purportedly interfered with. Insofar as Plaintiff argues that it has "satisfactorily pled the existence of contracts that [Defendants] have interfered with, including Customers A, B, and C," [Doc. 65 at 19], the Court disagrees. The Amended Complaint does not actually allege that Customer A, Customer B, or Customer C breached any contract with Plaintiff, *see* [Doc. 32], which is a necessary element of the claim, *Hertz*, 576 F.3d at 1118 ("[T]he contract must be breached. If the contract has been fully performed, then there has been no interference.").

"Most business-tort cases do identify the specific contracts allegedly disrupted." *Cocona, Inc. v. Singtex Indus. Co.*, No. 14-cv-01593-MJW, 2014 WL 5072730, at *13 (D. Colo. Oct. 9, 2014) (citing cases). "That identification is important: '[a]bsent notice to the

defendants of some facts surrounding the type or nature of the 'contracts' their conduct allegedly interfered with,' a claim does not satisfy even Rule 8(a) pleading standards." *Id.* (*quoting AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 956 (N.D. Cal. 2003)).

While Plaintiff argues that it "does not need to *prove* any contracts at this early stage, without the benefit of further discovery," [Doc. 65 at 19], it still must provide sufficient *factual* allegations to state a plausible claim, *Iqbal*, 556 U.S. at 678; *see also Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (instructing that courts must "disregard conclusory allegations," i.e., allegations "in which an inference is asserted without stating underlying facts or including any factual enhancement" (quotation omitted)). And Plaintiff does not explain why discovery is necessary for it to identify its own contracts with its own customers that its own customers allegedly breached or failed to perform on. *See* [Doc. 65 at 19].

There is one contract that Plaintiff identifies in the Amended Complaint—the Hilfer Agreement. CentiMark alleges that Nations and NROC knew of the Hilfer Agreement and "encourag[ed], allow[ed], and assist[ed] Hilfer" in breaching the Agreement. [Doc. 32 at ¶¶ 122–23]. Defendants maintain that Plaintiff cannot state a claim because "Plaintiff does not allege any wrongful means utilized by Nations/NROC to interfere with" the Hilfer Agreement. [Doc. 54 at 23]. They argue that Plaintiff's allegation that Nations and NROC "encourag[ed], allow[ed], and assist[ed] Hilfer to breach" the Agreement is conclusory and insufficient to support a plausible claim. [*Id.*]. CentiMark responds that "Defendants' conduct amounts to improper or wrongful means that itself is capable of forming the basis of their liability." [Doc. 65 at 18]. Plaintiff asserts that "[g]iven the misappropriation claim,

breach of contract, and unjust enrichment claims at issue, it is evident that Defendants' interference is independently actionable, and therefore appropriately relieved through tortious interference claims."  [*Id.* at 18–19].

The Court is respectfully unpersuaded by Plaintiff's argument.  Neither the misappropriation claim nor the breach of contract claim is asserted against Nations or NROC, [Doc. 32 at ¶¶ 80–105], so those claims do not provide support for Plaintiff's position that Nations or NROC acted improperly.  As for the unjust enrichment claim against the entities, that claim contains only conclusory allegations that Nations and NROC "collaborated with" Mr. Hilfer and assisted him in breaching the Hilfer Agreement. [*Id.* at ¶ 134].  These allegations are insufficient to plausibly allege that Nations or NROC acted "improperly."  *See DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1179 (D. Colo. 2019) (allegations that defendants "plot[ted]" with former employee to "steal" the plaintiff's business and "induced" the employee to breach his employment agreement were insufficient); *Insight Glob. LLC v. McDonald*, No. 17-cv-01915-MSK-MJW, 2018 WL 2092486, at *4 (D. Colo. May 3, 2018) (dismissing interference claim because the defendant's knowledge of employee's contractual obligations to former employer did "not indicate how [the defendant] induced [the former employee] to breach them").[7]

Accordingly, the Court agrees with Defendants that Plaintiff does not state a plausible claim for tortious interference with a contract against any Defendant.  Claim Five

---

[7] Both Parties frame this issue in part as a component of a "competitor's privilege" affirmative defense.  *See* [Doc. 54 at 22; Doc. 65 at 18].  Because improper inducement is an element of a tortious interference claim, *Krystkowiak*, 90 P.3d at 871; *Covelo Clothing, Inc. v. Midcap Credit LLC*, No. 17CA0104, 2018 WL 11714638, at *4 (Colo. App. Mar. 1, 2018), the Court finds it more appropriate to frame its analysis as an evaluation of Plaintiff's pleading requirements, not the assertion of any affirmative defense.

will be **DISMISSED without prejudice**.

> **e.     Claim Seven:     Tortious Interference With Prospective Business Relations**

The Court next turns to Claim Seven due to its significant similarities to Claim Five. Defendants seek dismissal of Claim Seven, which asserts a claim of tortious interference with prospective business relations, based on CUTSA preemption, the economic loss rule, and failure to state a plausible claim.  [Doc. 54 at 16–23].

***CUTSA Preemption.***  Defendants contend that the claim for tortious interference with prospective business relations is preempted "[t]o the extent that . . . [it] relate[s] to CentiMark's allegation that the Defendants took, disclosed, or used CentiMark's information." [*Id.* at 16].  This argument is not developed any further aside from a citation to *RV Horizons, Inc. v. Smith*, where this Court held that a tortious interference claim was preempted by CUTSA.  *See* [*id.*]; *see also RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2019 WL 1077366, at *17 (D. Colo. Mar. 7, 2019) (concluding that interference claim was preempted because it was based on the improper use of trade secrets and was "indistinguishable from" a CUTSA claim).

The Court is respectfully unpersuaded by this limited argument.  First, Plaintiff alleges that Defendants engaged in tortious interference with prospective business relations by, inter alia, using Plaintiff's non-trade-secret (but still confidential and valuable) information to divert customers away from Plaintiff's business.  [Doc. 32 at ¶¶ 79, 139–45].  Thus, unlike *RV Horizons*, the interference claim is not "indistinguishable" from a CUTSA claim.  *Cf. M.M.A. Design*, 2019 WL 3973935, at *4 (finding claims were not preempted "to the extent they concern[ed] information that [was] not a 'trade secret' under state law").  Moreover, as explained above, when a claim "involv[es] a trade secret

misappropriation issue" but also "include[s] additional elements not necessary for a misappropriation claim," CUTSA preemption does not apply. *Powell*, 948 F. Supp. at 1474. Since "[t]ortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract," *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995), and a CUTSA misappropriation claim contains no such requirement, *Gates Rubber Co.*, 9 F.3d at 847, the tortious interference claim is not preempted.

    ***Economic Loss Rule.*** Next, Defendants assert that the economic loss rule bars, and requires dismissal of, Claim Seven. [Doc. 54 at 19]. For the reasons discussed above, *see supra* Section I.B.2.b., the Court declines to make a ruling on the application of this doctrine at the pleading stage.

    ***Rule 12(b)(6).*** To state a claim for tortious interference with prospective business relations, CentiMark must allege "(i) that the Defendants either induced a third person not to enter into or continue a contractual relationship with [Plaintiff], or prevented [Plaintiff] from acquiring or continuing the prospective relation; (ii) that the Defendants did so intentionally; and (iii) that they used improper means to do so." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1085–86 (D. Colo. 2012) (citing *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007)). Defendants argue that the claim for tortious interference with prospective business relations "fails because the [Amended Complaint] does not identify any particular business expectancies at issue, nor does it include any allegations to establish that such unidentified expectancies had materialized beyond a mere hope of future work." [Doc. 54 at 24–25]. In Defendants' view, "CentiMark fails to even proffer any factual allegations

sufficient to establish that these (unidentified) prospective relationships were damaged or inhibited by Defendants' alleged actions or *how*." [*Id.* at 25]. In response, CentiMark asserts that its allegations are adequate because it has alleged "the existence of" Plaintiff's "continuing relationships [with] Customers A, B, and C" as an incumbent service provider, and it suggests that these allegations are "'sufficient to establish a reasonable probability' that a contract would have resulted absent the [tortious] interference." [Doc. 65 at 19 (quoting *L-3 Commc'ns Corp.*, 863 F. Supp. 2d at 1086)]; *see also* [*id.* (arguing that "[t]he nature of CentiMark's continuing business with its customers is significant to its interference claims")].

At the motion-to-dismiss stage, the Court must accept Plaintiff's allegations as true and view them in the light most favorable to Plaintiff. *Casanova*, 595 F.3d at 1124. The Court must also draw all reasonable inferences from the allegations in the light most favorable to Plaintiff. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). In so doing, the Court finds that Plaintiff's allegations are sufficient at the pleading stage to survive a Rule 12(b)(6) motion. CentiMark alleges that it "has numerous prospective contractual relations with customers . . . and prospective customers," which clearly includes Customers A, B, and C. [Doc. 32 at ¶¶ 140–41]; *see also* [*id.* at ¶ 139 (incorporating prior allegations by reference, including those regarding Customers A, B, and C)]. Plaintiff alleges that Defendants "intentionally and improperly utilized [its] Confidential Information to interfere with [its] prospective business relationships and divert those relationships to Nations Roof." [*Id.* at ¶ 142].[8] And elsewhere, it describes how

---

[8] In an unpublished case, the Tenth Circuit recognized that "several Colorado courts have held that, in a tortious interference with prospective business relations case, it is not necessary that the plaintiff identify a specific customer relationship or a specific customer

Defendants allegedly did so—by using CentiMark's Confidential Information related to business strategies surrounding prospective or existing customers to solicit those customers and divert business away from CentiMark.  *See* [*id.* at ¶¶ 56–65].  Plaintiff alleges that Defendants' actions have "damag[ed] its prospective business relationships with its employees and customers."  [*Id.* at ¶ 144].  While Plaintiff's allegations may not contain significant factual detail, they are sufficient to state a claim at this stage in the proceedings.  The Court finds no basis to dismiss Claim Seven at this time.

f.    **Claim Six:  Unjust Enrichment Against Nations and NROC**

Defendants argue that this claim should be dismissed because (1) it is preempted by CUTSA, [Doc. 54 at 13–16 & n. 4]; and (2) Plaintiff fails to state a claim under Rule 12(b)(6), [*id.* at 25–26].

***CUTSA Preemption.***  Defendants argue in a footnote that the unjust enrichment claim against the entities is preempted because "CentiMark generally alleges that . . . Nations and NROC utilized CentiMark's 'Confidential Information' to solicit CentiMark's customers and employees and to compete against CentiMark," and these allegations "are subsumed within the common nuclei of facts underlying the CUTSA claim and are preempted by CUTSA."  [*Id.* at 15–16 & n.4].  Plaintiff argues in response that the CUTSA claim cannot preempt any claims against Nations and NROC because the CUTSA claim

---

with whom [it] had a prospective relationship."  *Pers. Dep't, Inc. v. Pro. Staff Leasing Corp.*, 297 F. App'x 773, 777 (10th Cir. 2008) (cleaned up) (applying Colorado law); *but see Kalhorn v. Pham*, No. 18-cv-01685-RBJ, 2021 WL 2102820, at *11–12 (D. Colo. May 25, 2021) (discussing conflicting case law about the elements of an interference with prospective business relations claim, and ultimately concluding that even if "knowledge of a *specific* prospective business advantage is not required," the "defendant must have knowledge of *something* related to plaintiff's business in order for the tort to be established").  The Parties do not raise arguments debating the required elements of the claim, and so the Court does not definitively rule on this issue.

is only raised against Mr. Hilfer.  [Doc. 65 at 10].  In their reply brief, Defendants assert that "[w]hile Colorado courts have not addressed whether CUTSA preemption can be avoided by pleading trade secret misappropriation against one defendant and related tort claims against others, a Utah court found that tort claims against non-trade-secret-defendants were nevertheless preempted."  [Doc. 68 at 5 (citing *CDC Restoration & Const., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 322, 333 (Utah Ct. App. 2012))].

The Court could similarly locate no Colorado state or federal courts addressing this issue, but it finds *CDC Restoration* distinguishable.  The *CDC Restoration* court did not specifically address whether a misappropriation claim against one defendant could preempt a separate claim against an entirely different defendant, and there is no indication in that order that the *CDC Restoration* court was even presented with that issue. Moreover, the *CDC Restoration* opinion—which applies Utah law—applied a preemption standard different from to standard set out in the Colorado case law cited above; in *CDC Restoration*, the court concluded that "a claim is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information."  *CDC Restoration*, 274 P.3d at 331.  Colorado courts do not apply such a broad preemption standard; rather, CUTSA does not preempt "claims that, although involving a trade secret misappropriation issue, include additional elements not necessary for a misappropriation claim under . . . [C]UTSA."  *Powell Prods.*, 948 F. Supp. at 1474.

Although Colorado courts have not addressed this issue, the Court declines to rule at the pleading stage that a CUTSA claim can preempt a separate claim against an

entirely different defendant—who is not alleged to have misappropriated trade secrets—simply because there *may* be some overlap in the underlying facts. Accordingly, this claim is not preempted.

*Rule 12(b)(6).* Alternatively, Defendants contend that Plaintiff's unjust enrichment claim against Nations and NROC should be dismissed because the claim is not "supported by any factual allegations whatsoever." [Doc. 54 at 26]. Respectfully, the Court finds that this argument is insufficiently developed in the context of this case. A generalized argument that these claims lack factual development, without any argument addressing the elements of the claim or explaining why the factual allegations in the 150-paragraph Amended Complaint are insufficient to state a claim, does not meaningfully present a Rule 12(b)(6) argument to the Court. And it is not this Court's duty to independently, without any substantive argument from Defendants, review the Amended Complaint or conduct research on Defendants' behalf to ascertain whether Plaintiff's allegations plausibly a claim. *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (quotation omitted)); *Statebridge Co. v. Martin-Powell, LLC*, No. 18-cv-02279-KLM, 2019 WL 2866692, at *9 (D. Colo. July 3, 2019) (denying motion to dismiss where the defendant's "scant argument cite[d] no legal authority and d[id] not address the elements of a breach of contract claim"). Accordingly, the Court will not dismiss the unjust enrichment claim against Nations and NROC.

### g.    Claim Eight:  Civil Conspiracy

Finally, Defendants argue that Plaintiff's civil conspiracy claim should be dismissed

because it is preempted by CUTSA, barred by the economic loss rule, and insufficiently pled. [Doc. 54 at 16–17, 25–26].

*Preemption.* "To state a claim for civil conspiracy under Colorado law, a plaintiff must allege: '(1) two or more persons . . .; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.'" *Wagner v. CHER, LLC*, No. 18-cv-01007-STV, 2018 WL 6046432, at *5 (D. Colo. Nov. 19, 2018) (quoting *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1153 (D. Colo. 2005)). Here, Plaintiff alleges that Mr. Hilfer, Nations, and NROC engaged in a conspiracy "to effectuate the breach of Hilfer's fiduciary duties to CentiMark and the misappropriation of CentiMark's Confidential Information, trade secrets, business information, and proprietary resources." [Doc. 32 at ¶ 147]. Defendants' preemption argument is bare, relying on its arguments with respect to the fiduciary duty claim and the fact that "trade secrets" are mentioned in paragraph 147 of the Amended Complaint. [Doc. 54 at 16–17]. This argument is insufficient to show preemption. The conspiracy claim is not simply "a restatement of the same operative facts" underlying the misappropriation claim, *Abbott Labs*, 2017 WL 5517399, at *3, and instead requires "additional elements not necessary for a misappropriation claim," *Powell*, 948 F. Supp. at 1474. The claim is not preempted.

*Economic Loss Rule.* Defendants argue that the conspiracy claim is barred by the economic loss rule. [Doc. 54 at 17]. For the reasons discussed above, *see supra* Section I.B.2.b., the Court declines to make a ruling on the application of this doctrine at the pleading stage.

*Rule 12(b)(6).* Defendants also contend that the civil conspiracy claim should be

dismissed because it is not "supported by any factual allegations whatsoever." [Doc. 54 at 26]. As the Court explained above, this argument is not sufficiently presented to the Court, and the Court will not independently review the Amended Complaint to compare the factual allegations against the required elements of a conspiracy claim. *Wooten*, 377 F.3d at 1145; *Statebridge*, 2019 WL 2866692, at *9. Accordingly, the Court will not dismiss the conspiracy claim as to any Defendant.[9]

For the reasons set forth above, the Motion to Dismiss is **GRANTED in part** and **DENIED in part**. Claims Four and Five are **DISMISSED without prejudice**.

## II.    The Motion for Preliminary Injunction

CentiMark seeks a preliminary injunction with respect to five of its claims: Claim One (breach of contract against Mr. Hilfer); Claim Two (CUTSA misappropriation against Mr. Hilfer); Claim Three (breach of fiduciary duty against Mr. Hilfer); Claim Four (unjust enrichment against Mr. Hilfer); and Claim Six (unjust enrichment against Nations and NROC). [Doc. 18 at 9–20]. Because the Court has dismissed Claim Four, the Court's analysis focuses on the other four causes of action.

### A.    Legal Standard

"Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018). A party seeking preliminary injunctive relief must make

---

[9] Defendants argue in their reply brief that "a corporation and its employees do not constitute the two or more persons required for a civil conspiracy, at least if the employees are acting on behalf of the corporation and not as individuals for their individual advantage." [Doc. 68 at 11 (quotation omitted)]. This argument was not raised in the Motion to Dismiss, and the Court does not address arguments that were raised for the first time in a reply brief. *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019).

a four-part showing, demonstrating that (1) the movant has a likelihood of success on the merits of its claims; (2) the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction would be in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). A party seeking an injunction must demonstrate that "*all four* of the equitable factors weigh in its favor," *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013), and a "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted," *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014).

The primary goal of a preliminary injunction is to preserve the pre-trial status quo. "Status quo" is defined to be the last uncontested status between the parties that preceded the controversy until the outcome of the final hearing. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005). Therefore, courts view the following types of injunctions with caution:  (1) preliminary injunctions that alter the status quo; (2) preliminary injunctions that require the nonmoving party to take affirmative action, i.e., "mandatory" preliminary injunctions; and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). Whether to issue a preliminary injunction lies in the discretion of the trial court. *See id.*

### B.    Analysis

#### 1.    Request for Injunctive Relief Against Nations and NROC

The Court first addresses CentiMark's request for injunctive relief against Nations and NROC. CentiMark seeks a Court order requiring, inter alia, Nations and NROC to

"return or destroy all CentiMark Confidential Information," "immediately cease contact with any CentiMark customer" or "any . . . potential customer listed in Hilfer's CentiMark sales 'workbooks,'" and "cease attempts to solicit and/or recruit CentiMark employees." [Doc. 18 at 2]. However, the Amended Complaint contains no request for this sort of injunctive relief, or *any* injunctive relief, against Nations or NROC—the Amended Complaint seeks only injunctive relief against Mr. Hilfer. *See* [Doc. 32 at 32 (requesting "[p]reliminary and permanent injunctive relief requiring Hilfer to abide by the terms of the Hilfer Agreement and extending the term of the Hilfer Agreement for twelve (12) months after the entry of any preliminary injunction")]. And as explained above, with respect to Nations and NROC, the Motion for Preliminary Injunction concerns only Plaintiff's unjust enrichment claim. *See* [Doc. 18 at 9–20].

There are a few deficiencies with respect to CentiMark's request for injunctive relief against Nations and NROC. "A preliminary injunction is . . . appropriate to grant intermediate relief of the same character as that which may be granted finally." *Hicks v. Jones*, 332 F. App'x 505, 508 (10th Cir. 2009) (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (alteration in original)). "A preliminary injunction will not be granted when it seeks different relief or when it deals with matters outside the issues in the underlying suit." 11A Wright & Miller's Federal Practice & Procedure § 2947 (3d ed. Sept. 2025 update). The Motion for Preliminary Injunction seeks equitable relief not requested in the Amended Complaint; in other words, it seeks relief the Court could not ultimately grant. *See George v. George*, No. 8:21-cv-00424-JMG-SMB, 2022 WL 625154, at *2 (D. Neb. Mar. 3, 2022) (deeming it "hard" to find a relationship between the request for injunctive relief and underlying claims where "the plaintiff's complaint [did not]

even seek final injunctive relief, meaning that the plaintiff [was] improperly asking for a preliminary injunction providing more relief more than could be granted finally").  And Plaintiff does not explain how its request for injunctive relief against Nations and NROC, including the request for an order broadly prohibiting Nations and NROC from contacting even potential CentiMark customers, is related to its claim for unjust enrichment against Nations and NROC.  "When the movant seeks intermediate relief beyond the claims in the complaint, the court is powerless to enter a preliminary injunction."  *Zachary v. Englebird*, No. 21-cv-02129-PAB-KLM, 2023 WL 120975, at *2 (D. Colo. Jan. 6, 2023) (quotation omitted).

Moreover, Plaintiff does not explain how, if an injunction is not entered against Nations and NROC, it will suffer irreparable harm that cannot be compensated through money damages.  While Plaintiff raises arguments about irreparable harm to its business value and goodwill, [Doc. 18 at 21–22], it does not connect any such harm to its unjust enrichment claim against Nations and NROC, which alleges an unjustly retained benefit on the part of Nations and NROC, [Doc. 32 at ¶¶ 137–38].  And since unjust enrichment "is a legal claim in quasi-contract for money damages based upon principles of restitution," *DCB Constr. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 118 (Colo. 1998), it is unclear to the Court why any injury related to Plaintiff's unjust enrichment claim could not be remedied through money damages.

Accordingly, the Court finds that Plaintiff has not demonstrated an entitlement to the preliminary injunctive relief requested against Nations and NROC.  The Motion for Preliminary Injunction is respectfully **DENIED** as to those Defendants.

## 2.    Request for Injunctive Relief Against Mr. Hilfer

To obtain a preliminary injunction, the movant must show (1) a likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities favors an injunction; and (4) an injunction would be in the public interest. *Petrella*, 787 F.3d at 1257. "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction," so "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (quotation omitted). Here, the Court's analysis begins and ends with irreparable harm.

As a preliminary matter, CentiMark argues in its Motion that "[p]laintiffs do not need to show irreparable harm 'when the evidence shows that the defendants engaged in . . . the act or practices prohibited by a statute which provides for injunctive relief to prevent such violation.'" [Doc. 18 at 20 (quoting *Star Fuel Marts, LLC v. Sam's E., Inc.*, 362 F.3d 639, 652 (10th Cir. 2004) (alteration in original))]. To the extent *Star Fuel* relaxes the test for a preliminary injunction, that case is no longer good law. The Tenth Circuit has recognized that "Supreme Court cases following *Star Fuel* clarified the narrow circumstances when a presumption of irreparable injury could apply." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1140 (10th Cir. 2017) (cleaned up). "Courts may presume irreparable harm only when a party is seeking an injunction under a statute that *mandates* injunctive relief as a remedy for a violation of the statute." *Id.* "When, by contrast, a statute merely *authorizes* injunctive relief, courts may not presume irreparable harm, as doing so would be contrary to traditional equitable principles." *Id.* (quotation omitted). Because CUTSA authorizes, but does not mandate, the provision of injunctive

relief, there is no presumption of irreparable harm.  *Id.* at 1142–43.

Plaintiff alternatively argues, however, that it "has already been irreparably damaged."  [Doc. 18 at 21].  It goes on to relay case law explaining that irreparable injury exists if, for example, money damages would be inadequate or difficult to quantify, or where a company experiences harm to its goodwill, diminished competitiveness, or lost business opportunities.  [*Id.* (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (further citations omitted))].  It asserts, without explanation, that "[e]ach of those circumstances [is] evident here."  [*Id.*].  CentiMark also argues that because "[d]amages from the loss of CentiMark's goodwill are . . . impossible to quantify," this establishes irreparable harm.  [*Id.* at 22].

The Court has reviewed each of the comparator cases cited by Plaintiff.  In *Bar Method Franchisor LLC v. Henderhiser LLC*, 580 F. Supp. 3d 979 (D. Colo. 2022), there was "significant, if not undisputed," evidence that a former franchisee "had converted approximately 50 percent of the former [franchise's] customers to [her new company], as well as most of the employees of the former franchise," *id.* at 989.  In *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001),[10] the Tenth Circuit affirmed the trial court's finding of irreparable harm where the plaintiff's CEO "testified that [the plaintiff's] *preexisting* business had already suffered from [the defendant's] actions" and also expressed concerns about damage to future business, *id.*

---

[10] Plaintiff cites *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004), for the proposition that irreparable harm exists "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."  [Doc. 18 at 21].  That quote does not appear in the 2004 *Dominion Video Satellite* case, but does appear in the 2001 *Dominion Video Satellite* case.  *See Dominion Video Satellite*, 269 F.3d at 1156.

at 1156.  And in *SBM Site Services*, the district court granted a preliminary injunction based on evidence that (1) a former employee, "in the weeks immediately preceding his resignation," took "thousands of pages of [the employer's] documents," including the company's internal customer "pipeline" and pricing documents; (2) the stolen documents included items that took "thousands of man-hours to develop"; (3) after the employee went to another company, the other company started doing business in Colorado; (4) "[u]sing [the plaintiff's] trade secrets," the defendant's new employer became a "preferred supplier" of one of plaintiff's clients; and (5) as a result of the new employer becoming a "preferred supplier," the new employer was awarded a contract that the plaintiff company lost out on, *see* 2011 WL 7563785, at *6–7.

The common thread within these cases is that the plaintiff sufficiently demonstrated irreparable harm from the evidence in the record.  That is simply not the case here; Plaintiff fails to cite to specific evidence of the lost goodwill, business opportunities, or competitive advantage it asserts in its Motion.  *See* [Doc. 18 at 20–22]; *see also* [Doc. 61 at 12–14].  Despite the lack of specific citations to evidence, the Court has independently reviewed the declarations submitted by Plaintiff and finds they are insufficient to support Plaintiff's assertions of irreparable harm.

First, with respect to Mr. Hilfer's emails, Plaintiff asserts that "[i]n the weeks before he resigned, and in breach of the Hilfer Agreement, Hilfer sent multiple emails containing CentiMark Confidential Information from his CentiMark email to his personal email address."  [Doc. 18 at 6].  In support, it directs the Court to a declaration of CentiMark's network engineer, Michael Reynolds, who says that in 2023 and 2024, Mr. Hilfer sent 22 emails from his CentiMark email account to his personal account.  [Doc. 18-5 at ¶¶ 6–7].

And Shaun Bynum ("Mr. Bynum"), CentiMark's Vice President of National Accounts, has submitted a declaration stating that 14 of these emails contained CentiMark's confidential information. *See* [Doc. 61-1 at ¶ 17]; *see also* [Doc. 18-3 at ¶ 2]. This Court is certainly troubled by this evidence of Mr. Hilfer's actions and observes that it might support the likelihood of success factor on the breach of contract claim. *See* [Doc. 18-2 at §§ 2.1, 2.2]. But the Tenth Circuit has held that even in light of evidence demonstrating former employees taking confidential information, "the question is not whether [the] alleged wrongful conduct was real or theoretical. The question is whether their conduct caused and will continue to cause actual injury that cannot be compensated with money damages." *Keybank Nat'l Ass'n v. Williams*, No. 20-1384, 2022 WL 402379, at *4 (10th Cir. Feb. 10, 2022); *see also Dominion Video*, 356 F.3d at 1263–64 (irreparable harm "do[es] not automatically" arise from the breach of exclusivity, non-compete, or non-disclosure agreements). Here, CentiMark has failed to point this Court to any evidence connecting any confidential information reflected in these 14 emails to any actual injury—e.g., any provision of the information to Nations or NROC or any misuse of the information in soliciting prospective clients.

Second, Plaintiff also argues that there is proof that Mr. Hilfer has been using CentiMark's confidential information to improperly solicit Customers A, B, and C. [Doc. 18 at 6–7]. It contends that it is "undeniable that . . . Hilfer is using CentiMark's Confidential Information and trade secrets to solicit business from the very customers he served as a CentiMark employee." [Doc. 61 at 12]. In support, Plaintiff provides the following evidence:

- A declaration from Mr. Bynum stating: "On June 2, 2025, a CentiMark employee reached out to me to inform me that a project manager at

Customer A was working with Nik Hilfer at Nations Roof.  The Customer A project manager also confirmed that Nations Roof was bidding on all of Customer A's capital work.  Nik's involvement with Customer A at Nations Roof is concerning because he has experience with and knowledge of CentiMark's pricing and marketing strategies for Customer A, along with the rest of CentiMark's Confidential Information."  [Doc. 18-3 at ¶ 13].

- A declaration from Mr. Bynum stating:  "On June 3, 2025, a CentiMark employee forwarded to me an email invite for a Q&A Session for a Texas roof project for Customer B.  Nik Hilfer's information at Nations Roof was included on the invite list.  Nik's involvement with Customer B at Nations Roof is concerning because he has experience with and knowledge of CentiMark's pricing and marketing strategies for Customer B, along with the rest of CentiMark's Confidential Information."  [*Id.* at ¶ 14].

- A declaration from Daryl Klinge, CentiMark's Vice President of Global Accounts, [Doc. 18-6 at ¶ 2], stating:  "June 2025, [sic] Nik texted me to ask if I would be at a roof walk in Tennessee for Customer C.5.  It appeared to me that Nik asked me that question as a means of alerting me both that he was aware of my relationship with Customer C.5 and that he was seeking to market Nations Roof's services to Customer C.5," [*id.* at ¶ 11].

Plaintiff argues that "CentiMark and its market position, customer relationships, business goodwill, and overall competitive edge will continue to suffer imminent and irreparable harm if Hilfer . . . [is] not enjoined."  [Doc. 18 at 22].  However, none of these declarations provide *any* showing that Mr. Hilfer has actually used, relied on, or revealed CentiMark's Confidential Information since his departure from the company or in the course of his employment at Nations and/or NROC.  Mr. Hilfer has declared under penalty of perjury that he has "never . . . used any CentiMark materials to assist [him] in performing services for any business other than CentiMark," [Doc. 43-1 at ¶ 21], and nothing submitted by Plaintiff rebuts that assertion.  For instance, CentiMark does not connect any of the confidential information purportedly reflected in the 14 emails to Customers A, B, or C. "Purely speculative harm"—such as Plaintiff's supposition that if Mr. Hilfer is contacting CentiMark's clients, he must be using CentiMark's confidential information to do so—

cannot justify a preliminary injunction.  *RoDa Drilling*, 552 F.3d at 1210.  "[T]here must be more than an unfounded fear on the part of the [movant]."  11A Wright & Miller's Federal Practice & Procedure § 2948.1.[11]

Third, contrary to Plaintiff's assertion that it "has already been irreparably damaged," there is simply no actual evidence of any harm suffered by Plaintiff's business. CentiMark has provided no evidence that it has lost customers, bids, or competitiveness in the marketplace and no evidence establishing a significant chance that this harm will occur in the future.  *See* [Doc. 18]; *see also Am. Republic Ins. Co. v. Great-W. Life & Annuity Ins. Co.*, No. 09-cv-02857-REB-MEH, 2010 WL 582368, at *4–5 (D. Colo. Feb. 17, 2010) (potential loss of customer goodwill did not justify preliminary relief where the plaintiff relied on "surmise and conjecture" and "failed to substantiate its assertion that goodwill in fact [would] be lost"); *see also Empower Annuity Ins. Co. of Am. v. Empower Fin., Inc.*, No. 23-cv-00062-CNS-SKC, 2023 WL 5938831, at *2–3 (D. Colo. Sept. 12, 2023) (denying motion for preliminary injunction where the plaintiff had no evidence that it "lost any business, revenue, or that it faces a significant risk of losing business or revenue" and had not identified any lost customers); *Fuel Automation Station, LLC v. Frac Shack Inc.*, No. 20-cv-01492-STV, 2021 WL 6118728, at *5 (D. Colo. Nov. 10, 2021) (declining to enter injunction where the plaintiff "ha[d] not offered any evidence that it ha[d] actually lost any business or that it face[d] a significant risk of losing business").  And while CentiMark's allegations, viewed in the light most favorable to it, are sufficient to

---

[11] Plaintiff does not appear to argue that a breach of the Hilfer Agreement's non-solicitation of customers provision would result in irreparable harm.  *See* [Doc. 18].  The Court does not find that it would, as "breach-of-contract claims are prototypically of the type that are compensable with money damages."  *Zoll Data Sys., Inc. v. Wave HDC, LLC*, No. 24-cv-00584-DDD-KAS, 2025 WL 2491277, at *7 (D. Colo. Apr. 7, 2025).

survive dismissal of certain claims at this juncture, such unsupported allegations are insufficient to justify a preliminary injunction.

Finally, CentiMark argues that "[d]amages from the loss of CentiMark's goodwill are also impossible to quantify, resulting in irreparable harm." [Doc. 18 at 22]. But an inability to quantify damage is just one of several factors to consider in determining whether irreparable harm exists. *See Dominion Video Satellite*, 356 F.3d at 1263. An inability to calculate damages in the event of an injury is insufficient to justify a preliminary injunction where the movant has not shown an actual or significant risk that an injury will occur. *See Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (explaining that the "irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that [it] will experience harm that cannot be compensated after the fact by monetary damages" (quotation omitted)). Moreover, Plaintiff simply assumes, without explanation, that any loss of goodwill will be "impossible to quantify." [Doc. 18 at 22]; *see also* [Doc. 61 at 13 ("The human aspect of [Plaintiff's client] relationships and the goodwill derived from them are entirely intangible, unquantifiable, and incapable of repair.")]. But in many cases, a loss of customers or contracts *will* be calculable. *See, e.g.*, *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1272 (10th Cir. 2018) (concluding that "the prior loss of [the plaintiff's] customers and consultants and the general decline of [the plaintiff's] value as a business can be quantified in money damages"). Thus, this alone is insufficient to demonstrate irreparable injury.

Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Port City Props.*, 518 F.3d at 1190. Because Plaintiff has not demonstrated that it will suffer an irreparable injury without the issuance of a preliminary

injunction against Mr. Hilfer, the Court will not grant this extraordinary remedy. *Vill. of Logan*, 577 F. App'x at 766. The Motion for Preliminary Injunction is respectfully **DENIED**.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1) CentiMark's Motion for Preliminary Injunction Against Nikolaus Hilfer, Nations Roof, LLC, and Nations Roof of Colorado, LLC [Doc. 18] is **DENIED**;

(2) Defendants' Motion to Dismiss Plaintiff's First Amended Complaint [Doc. 54] is **GRANTED in part** and **DENIED in part**; and

(3) Claims Four and Five are **DISMISSED without prejudice** under Rule 12(b)(6).

DATED:  January 20, 2026                    BY THE COURT:

Nina Y. Wang
United States District Judge